IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| MICHAEL KANCE, | ) | Case No. 1:18-cv-1898 |
|---|---|---|
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

**I.      Introduction**

Plaintiff, Michael Kance, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. § 405(g) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 12. Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating the medical opinions, the Commissioner's final decision denying Kance's application for DIB and SSI must be VACATED and the matter REMANDED for further proceedings consistent with this memorandum of opinion and order.

## II. Procedural History

On December 24, 2015, Kance applied for DIB and SSI. (Tr. 216, 220).[1] Kance alleged that he became disabled on December 30, 2014 (Tr. 216, 220) due to Dupuytren's contracture, depression, anxiety, nervousness and hives. (Tr. 97). The Social Security Administration denied Kance's applications initially and upon reconsideration. (Tr. 146, 149, 157, 164). Kance requested an administrative hearing. (Tr. 69). ALJ Scott R. Canfield heard Kance's case on November 7, 2017, and denied the claim in a February 20, 2018, decision. (Tr. 14-29). On June 20, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5). On August 16, 2018, Kance filed a complaint to seek judicial review of the Commissioner's decision. ECF Doc. 1.

## III. Evidence

### A. Relevant Medical Evidence

As noted above, Kance claimed disability due to several conditions. (Tr. 97). However, he has limited his appeal to the ALJ's analysis of his Dupuytren's contractures of the hands and the related symptoms, restrictions and limitations in the use of his hands. ECF Doc. 14 at 5. For this reason, the court summarizes only the evidence related to the challenged issues.

In 2014, Kance's treating physician, Dr. Carl A. Robson, referred him for an assessment of the pain and contractures in his hands. (Tr. 348). The assessment showed that Kance had bilateral contractures with decreased pinch and grip strength. (Tr. 350).

On August 27, 2015, Kance was diagnosed with palmer fibromatosis/Dupuytren's contracture, which had progressed since his appointment a year earlier. (Tr. 348). Examination showed contractures of the ring and small fingers to 80 degrees at the metacarpophalangeal (MP) joint and 60 degrees at the proximal interphalangeal (PIP) joint, with palpable cords, notable

---

[1] The administrative transcript is in ECF Doc. 9.

tenderness about the cord to the small finger, and decreased pinch and grip strength.  Surgery was scheduled to treat Kance's condition.  (Tr. 348).

On October 9, 2015, Kance underwent left arm partial palmer fasciectomy with excision of digital extension ring and small fingers.  (Tr. 342).  His post-surgical diagnosis was left-hand palmar fibromatosis with digital extensions ring and small fingers.  (Tr. 342).

Following his surgery, Kance attended physical therapy.  (Tr. 325-340).  At his initial evaluation, he was fitted for splints and was instructed on their use.  (Tr. 339).  On November 10, 2015, Kance reported that he did not have pain unless pushing and then it was 4/10.  (Tr. 332).  On December 1, 2015, Kance reported 2/10 pain in his small finger.  He stated that he was trying to use his hand as much as he could.  He reported moving furniture, taking out trash and raking.  (Tr. 317, 321).  The therapist noted gradual gains in Kance's range of motion in his left hand with the exception of his small finger PIP joint.  (Tr. 318).  However, at his sixth appointment on December 8, 2015, Kance continued to lack range of motion in his hand and he had decreased grip strength.  (Tr. 326).

On January 27, 2016, Kance saw Dr. Robson, who noted that Kance still had very poor function and a weak grip, with the right hand worse than the left.  He was unable to hold tools or perform any manual labor.  (Tr. 355).

In January 2016, Kance's sister assisted him in filling out a function report.  (Tr. 262-269).  Kance reported struggling with grip strength and stiffness in his hands.  He reported that he did not cook; his sister cooked for him.  He didn't do any household chores except washing the dishes sometimes.  (Tr. 264).

Kance saw Dr. Robson on May 18, 2016.  (Tr. 359)  Kance's left-hand grip strength was 2/5 with contractures moderately reducing his left-hand range of motion.  (Tr. 360-361).  His right-hand grip strength was 3/5 with contractures moderately reducing the range of motion in

his right-hand fingers. (Tr. 361). Dr. Robson noted that due to "weakness of grip strength and dexterity" Kance was "totally unable to do any carpentry or any other work requiring hand grip and dexterity due to Dupuytren's contractures." (Tr. 359).

Kance saw Dr. Robson at his office on August 18, 2016. (Tr. 387). Dr. Robson noted, "hands – left surg scars, contraction 5th, Range of motion: mild pain w/motion, poor grip, Right: 4th tendon contracture, range of motion: mild pain with grip, poor grip…grip strength left, cannot register any change, right hand = 14mm change, :me: about 180 mm grip bilateral for comparison." (Tr. 388). Dr. Robson also noted that "with no significant grip strength either hand, he is absolutely disabled for any type of manual labor, total and permanent." He referred Kance back to the hand clinic to see if injections might help. (Tr. 389). Dr. Robson's treatment notes on September 15th restated his opinion that Kance was totally disabled. (Tr. 391, 393).

On March 28, 2017, Dr. Robson noted that Kance's strength was 1-2/5 in the left with weak grip and contractures and 2-3/5 in the right; he was unable to extend or make a fist. The left side was similar with poor strength and grasp. (Tr. 425).

### B. Relevant Opinion Evidence

#### 1. Treating Physician – Carl A. Robson, M.D.

Dr. Robson completed the first of two medical source statements on May 18, 2016. (Tr. 381-382). Dr. Robson opined that Kance's ability to lift/carry, stand/walk, and sit were not affected by his impairment. (Tr. 381). He opined that Kance could rarely climb or perform fine and gross manipulation. (Tr. 381-382). He opined that Kance should not be exposed to heights or moving machinery due to his unsafe gripping. He reported that Kance experienced moderate pain that would interfere with his concentration but would not take him off task or cause absenteeism. At the bottom of the questionnaire, Dr. Robson wrote that Kance "had experience

4

as carpenter – now totally disabled for this work. Has no other skills or training- cannot use hands for any occupation due to poor grip and dexterity." (Tr. 382).

On August 18, 2016, after examining Kance, Dr. Robson wrote a note stating, "In my opinion he is totally, permanently disabled for any type of labor with his hands, including dishwashing. His grip strength is virtually zero (measured). I don't think the state doc measured this." (Tr. 394).

On October 18, 2017, Dr. Robson completed his second medical source statement. (Tr. 428-429). Dr. Robson opined that Kance's ability to lift and carry was limited by his impairment and that he was limited to lifting 10-15 pounds occasionally and "none" frequently due to his palmar fasciitis and Dupuytren's contractures in both hands. He opined that Kance could never climb and could only occasionally balance, crouch, kneel and crawl. (Tr. 428). He opined that Kance's abilities to reach and pull were limited due to his poor grip and that he was unable to perform fine or gross manipulation. He noted that Kance's pain was minor and that it did not interfere with his concentration; would not take him off task; or cause absenteeism. (Tr. 429).

### 2.    Consultative Examiner – Robin Benis, M.D.

On February 8, 2016, Robin Benis, M.D. examined Kance and completed a report. (Tr. 363-367). Dr. Benis reported that Kance had contractures in both hands, decreased ability to flex all his fingers, especially the 4th and 5th fingers on both hands. (Tr. 365). He had decreased range of motion in the bilateral PIP and DIP joints and decreased grip strength and fine motor manipulation in both hands. (Tr. 365, 370). Dr. Benis opined that Kance had marked limitations using both hands due to Dupuytren's contractures. He was unable to hold objects for a long period of time, had difficulty writing and difficulty with fine motor manipulation of both hands. Dr. Benis opined that Kance's prognosis was fair. (Tr. 366).

5

### 3. State Agency Physicians

On February 22, 2016, state agency physician, Anne Prosperi, D.O., reviewed Kance's records and opined that he could perform light work; (Tr. 108) that he was able to occasionally lift and/or carry up to 20 pounds; and frequently lift and/or carry up to 10 pounds. (Tr. 105) She further opined that he was limited to occasional handling and fingering with both hands. (Tr. 109).

Elizabeth Das, M.D., reviewed Kance's records on July 3, 2016 and agreed with the functional limitations opined by Dr. Prosperi. (Tr. 122-124).

### C. Relevant Testimonial Evidence

Kance testified at the ALJ hearing. (Tr. 40-62). Kance lived with his sister. (Tr. 53). He stated he was 5'9" tall and weighed 130 pounds. He graduated from high school. Kance hadn't had a driver's license for ten years; he used public transportation. (Tr. 41). Kance previously worked as a spray painter. (Tr. 41-43). He was required to lift up to 75 pounds at that job. (Tr. 45).

In 2014, Kance could not continue his job due to problems with his hands. They would lock up; his fingers would contract, and he had to pry them off tools. (Tr. 46-47). Kance had surgery in 2015 on his left hand. (Tr. 47). His fingers were no longer contracted into a fist after the surgery, but otherwise the surgery did not help his condition. (Tr. 48). He attended physical therapy following his surgery but that did not help either. (Tr. 52). Kance could no longer close some of his fingers into a fist. Surgery was recommended for his right hand, but Kance feared that it would also be unsuccessful. (Tr. 48-49).

Kance wore a button-up shirt at the hearing. He was able to button shirts and tie shoes, but had some difficulty doing these activities. (Tr. 49-50, 58). Kance was unable to open jars because his hand would lock. (Tr. 50). He was able to lift a quart of milk, but not a gallon. (Tr.

6

52). His sister did the grocery shopping, and he went with her sometimes. She also did the housekeeping. Kance was able to take out the trash. (Tr. 53). Kance was able to attend to his hygiene but it took 15-20 minutes longer than it used to take. (Tr. 54). His hand condition was worse in cold weather. (Tr. 53).

Kance took medication to help with depression. (Tr. 55). He had a history of alcohol-use and cannabis-use disorders. (Tr. 60). However, he agreed that his disability applications were related to the limitation with the use of his hands. (Tr. 61).

Paula Zinsmeister, a vocational expert ("VE"), also testified at the hearing. (Tr. 63-67). The ALJ directed the VE to consider a hypothetical individual who was limited to light work with occasional push/pull hand controls bilaterally; he could never climb ladders, ropes or scaffolds; he could occasionally climb ramps or stairs and crawl; he was limited to occasional handling and fingering with the left upper extremity; he should avoid even moderate exposure to vibration; and he should avoid all exposure to hazards, such as dangerous machinery, unprotected heights, and concentrated temperature extremes. (Tr. 63-64). The VE testified that such an individual could work as an usher, furniture rental clerk, and information clerk. (Tr. 64). If the individual was limited to occasional handling and fingering with both upper extremities, the VE opined that he could no longer perform the job of information clerk but could still do the other two jobs and would be able to work as a school-bus monitor. (Tr. 64-65). The individual would still be able to perform these jobs if he was limited to routine tasks, with no strict time demands and no strict production quotas. (Tr. 66). However, if the individual was limited to lifting and carrying ten pounds occasionally, and no weight frequently, he would be limited to sedentary jobs and no jobs would be available. (Tr. 66).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. Kance had the following severe impairment: bilateral Dupuytren's contractures (palmar fibromatosis), status post left partial palmar fasciectomy with excision of digital extension ring and small fingers. (Tr. 19).

4. Kance did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 23).

5. Kance had the residual functional capacity to perform light work, except he was limited to occasional push/pulling of hand controls bilaterally; he could never climb ladders, ropes or scaffolds; he could occasionally climb ramps or stairs and crawl; he was limited to occasional handling and fingering bilaterally; he must avoid concentrated exposure to temperature extremes; he must avoid even moderate exposure to vibration; and he must avoid all exposure to hazards such as dangerous machinery and unprotected heights. (Tr. 23).

10. Considering his age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Kance could perform. (Tr. 28).

Based on all his findings, the ALJ determined that Kance was not under a disability from December 30, 2014, the alleged onset date, through the date of his decision. (Tr. 28).

## V. Law & Analysis

### A. Standard of Review

The court's reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court does not decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court would reach a different conclusion or

8

evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, -2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Medical Opinions

#### 1. Treating Source Opinions

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c).[2] An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)). Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Winschel v. Comm'r of*

---

[2] 20 C.F.R. §§ 404.1527(c) and 416.927(c) apply because Kance's claim was filed before March 27, 2017.

10

*Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. §§ 404.1527(c), 20 C.F.R. § 416.927(c). Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)–(6), 20 C.F.R. § 416.927(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c), 20 C.F.R. § 416.927(c). Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned."). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939.

Notwithstanding the requirement that an ALJ consider and weigh medical opinion evidence, the ALJ is not required to give any deference to opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 20 C.F.R. § 416.927(d). These issues include: (1) whether a claimant has an impairment or combination of impairments that meet or medically

equal an impairment in the Listing of Impairments; (2) the claimant's RFC; (3) the application of vocational factors; and (4) whether a claimant is "disabled" or "unable to work." 20 C.F.R. §§ 404.1527(d)(1)–(2), 20 C.F.R. § 416.927(d)(1)-(2).

Here, the ALJ failed to apply proper legal standards in evaluating the medical opinions. The ALJ properly recognized that he was not required to give some of Dr. Robson's statements any weight because those statements were opinions on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d), 20 C.F.R. § 416.927(d); (Tr. 25-26). Indeed, Dr. Robson made several statements that Kance was disabled, and the ALJ properly rejected them. However, the ALJ seemed to focus on those statements while omitting a meaningful evaluation of Dr. Robson's functional assessments.

The ALJ failed to comply with the regulations when he failed to give good reasons for assigning limited weight to Robson's functional assessments. *Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)–(6), 20 C.F.R. § 416.927(c)(2)-(6); (Tr. 25-26). Regarding Dr. Robson's functional assessments, the ALJ stated:

> Dr. Robson additionally completed two medical source statements. Dr. Robson completed the first medical source statement on May 18, 2016 (Exhibit 7F). In this statement, Dr. Robson opined that claimant can occasionally balance, kneel and crawl; rarely use fine and gross manipulation; occasionally reach and pull; and must avoid heights and moving machinery. He additionally opined the claimant has moderate pain that would interfere with concentration. Dr. Robson completed a second medical source opinion on October 18, 2017 (Exhibit 13F). In this statement , Dr. Robson opined that claimant cannot climb; can occasionally balance, crouch, kneel, crawl; frequently stoop, cannot safely use hands for gripping; has reaching limited by grip; pushing and pulling limited; unable to do fine and gross manipulations and grips of the hands. Additionally, Dr. Robson opined the claimant experiences mild pain that would not affect ability to concentrate.
>
> The undersigned recognizes Dr. Robson as the claimant's treating physician. The opinion of a treating physician must be given substantial or considerable weight unless good cause is shown to the contrary. A treating physician's medical opinion on the issue of the nature and severity of an impairment is entitled to special significance and, when supported by the medical evidence of record, is entitled to controlling weight (20 CFR § 404.1527 and 20 CFR § 416.927). Dr.

12

> Robson's second medical opinion source statement is less limiting that the original; in the second statement, Dr. Robson did not opine that pain would affect claimant's concentration. Just two months following hand surgery, the claimant could take out the trash, rake, and move furniture. The claimant can take care of his own personal hygiene, button shirts, wash dishes, and tie his shoes. The undersigned gives Dr. Robson's opinion limited weight.

(Tr. 26).

The ALJ was required to give controlling weight to Dr. Robson's opinions if they were 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and not inconsistent with the other substantial evidence in [the] case record. 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c)(2). The ALJ did not find that Dr. Robson's opinions failed to meet those requirements. Rather, he stated that Dr. Robson's second opinion was less limiting than the original and that Kance was doing some activities of daily living a couple months after his surgery. These were inadequate reasons for rejecting Dr. Robson's functional assessments.

Contrary to the ALJ's assertion, Dr. Robson's second opinion was not less limiting than his first opinion. The ALJ was correct in noting that Dr. Robson's October 2017 opinion stated that Kance's pain had lessened (mild instead of moderate) and that it would no longer interfere with his concentration. However, Dr. Robson's 2017 opinion was more limited in other areas. For example, in 2016, Dr. Robson opined that Kance did not have any limitations in lifting or carrying (Tr. 381), but in 2017 he opined that Kance was limited to lifting/carrying 10-15 pounds occasionally and none frequently. (Tr. 428). Thus, his second opinion was not necessarily less limiting than his first; in the area of lifting/carrying, it was *more* limiting. Dr. Robson opined that Kance's functional abilities had worsened and his pain level had improved. The differences in Dr. Robson's opinion statements – issued more than a year apart – was not a valid basis for rejecting his functional assessments.

Moreover, even if there were differences in Dr. Robson's two assessments of Kance's limitations, both opinions, having been issued more than a year apart, were still to be evaluated

separately. Kance's functional abilities could have changed in the interim, and Dr. Robson, as his treating physician, would have been in the best position to diagnose and document the changes. Simply declaring that the latter report reflected improvement, while remaining silent about areas of deterioration was inadequate to satisfy the requirements of SSA regulations.

The ALJ cited Kance's activities of moving furniture, raking and taking out trash as grounds for concluding he was not as limited as Dr. Robson asserted. But those were also inadequate reasons for rejecting Dr. Robson's medical opinions. The ALJ's decision did not cite medical records to support that these activities had occurred. (Tr. 26). However, it is likely that he was referring to Kance's physical therapy notes following his surgery. On December 1, 2015, the therapist noted that Kance was "using the left hand in [activities of daily living], beginning to use to help take trash out, raking, etc." (Tr. 321) On December 8, 2015, Kance told a therapist that he was trying to use his left hand as much as he could. He said, "I moved some furniture. It feels like arthritis in my joints." (Tr. 317). But testing at physical therapy showed that Kance's grip strength was far below that of a normal male his age. (Tr. 326). And, when Kance met with Dr. Robson on January 27, 2016, Dr. Robson noted, "Left had [*sic*] [Dupuytren's] contracture surgery done – insurance disallowed the injections. Then had 6 wks P.T. but still has very poor function poor grip right hand worse than left. Weak grip, unable to hold tools, unable to perform any manual labor, …" (Tr. 355). Testing by consulting physician, Dr. Benis, also showed abnormal grasp, manipulation, pinch and fine coordination. (Tr. 368). The medical record consistently shows that Kance had a weak grip and that his functional abilities were severely limited by his impairments. The fact that Kance told a physical therapist that he was trying to use his hand for daily activities was not a sufficient reason to reject Dr. Robson's functional assessments, particularly when the record does not indicate the frequency of the attempted activities.

Here, the ALJ's statements regarding Dr. Robson's two opinions and Kance's functional abilities were not fully accurate. Moreover, they did not constitute good reasons for assigning less than controlling weight to Dr. Robson's opinions. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; (Tr. 19-20). The ALJ failed to apply proper legal standards in evaluating Dr. Robson's opinions. This error was not harmless. Had Dr. Robson's 2017 opinion regarding Kance's ability to lift and carry been accepted, the ALJ would not have been able to find that Kance had the RFC to perform light work. And, the VE was not able to identify any jobs a hypothetical person like Kance could have performed if he was limited to sedentary work without the ability to lift any weight frequently. (Tr. 66).

The Commissioner argues that any error by the ALJ was harmless because the VE identified a job that Kance could perform (school bus monitor) which did not require reaching, handling, fingering or feeling. ECF Doc. 17 at 6. However, if the ALJ had accepted Dr. Robson's 2017 opinion that Kance was limited to lifting and carrying 10 to 15 pounds occasionally and no pounds frequently, the ALJ could not have relied on the VE's testimony regarding the school bus monitor. When specifically asked, the VE was unable to identify any jobs available to an individual who was limited to this amount and frequency of carrying and lifting. (Tr. 66).

### 2. Examining Physician and State Agency Reviewing Physicians

The ALJ also failed to assign the proper weight to the consulting physician, Dr. Benis. The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole,* 661 F.3d at 937. In determining disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart,* 710 F.3d at 375. Generally, more weight is to be given to the opinion

15

of an examining source than to the opinion of a source who has not examined the claimant. 20 CFR § 404.1527(c); 20 CFR § 416.927(c).

Dr. Benis examined Kance on February 8, 2016. (Tr. 363). Dr. Benis opined that Kance had marked limitations using both hands due to his Dupuytren's contractures. He opined that Kance was unable to hold objects for long periods of time, had difficulty writing, and difficulty with fine motor manipulation with both hands. (Tr. 366). In considering Dr. Benis's opinion, the ALJ simply stated that he "gave the opinion weight to the extent it supports the residual functional capacity above. The medical record documents hand limitations that have been incorporated into the residual functional capacity." (Tr. 27).

The ALJ then assigned considerable weight to the non-examining state agency medical physicians.[3] His reasoning for assigning more weight to the non-examining physicians was that they were "consistent with the medical record as a whole." He then stated, "the claimant has documented hand problems but can still move furniture, tie shoes and button shirts." (Tr. 27). The ALJ did not indicate that Dr. Benis's opinion was inconsistent with the medical record or lacked support. And, he did not acknowledge that the medical records consistently showed that Kance's grip strength was abnormal and was consistent with Dr. Benis's opinion. The ALJ noted that Kance could tie shoes and button shirts but didn't note that Kance had considerable difficulty doing these activities. (Tr. 49-50, 58).

The ALJ was not required to provide good reasons for the weight assigned to the opinions of the examining consultant and/or the state-agency reviewing physicians. However, the regulations state that an examining physician's opinion is usually given more weight than a

---

[3] Kance argues that the ALJ should not have relied on the state agency physicians' opinions because one was an anesthesiologist and the other a hematologist. ECF Doc. 14 at 13. This argument is not well taken. Regardless of their areas of expertise, there is no evidence that these physicians were unqualified to review Kance's records and render opinions.

non-examining source. The ALJ assigned more weight to non-examining physicians and his reasoning did "not build an accurate and logical bridge between the evidence and the result." *Fleischer,* 774 F. Supp. 2d at 877.

Because the ALJ failed to articulate good reasons for assigning limited weight to the opinion of Kance's treating physician and failed to adequately explain the weight assigned to the other opinions of record, his decision must be remanded for further proceedings consistent with this order.

**C.     RFC Determination**

Kance also argues that the ALJ's assessment of his RFC was not supported by substantial evidence. At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 20 C.F.R. § 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p-, 1996 SSR LEXIS 5). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).

Here, the ALJ did not properly evaluate the opinion evidence. Had the ALJ assigned controlling weight to the treating physician's opinion or greater weight to the consulting examiner, Kance's RFC may well have been limited to the sedentary level. The VE testified that there would not be any jobs for an individual who was limited to sedentary work and could not lift any weight frequently. (Tr. 66). For these reasons, the ALJ should reevaluate Kance's RFC after properly evaluating the opinion evidence.

17

### D. Listing 1.02

Finally, Kance argues that the ALJ failed at Step Three to adequately evaluate whether his impairment met or medically equaled Listing 1.02(B). Listing 1.02 concerns major dysfunction of a joint(s) (due to any cause). Conditions satisfying this Listing will be:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankyloses, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joint(s). With:

\* \* \*

> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Part 404, Subpart P, Appendix 1.02. Kance contends that the ALJ failed to properly evaluate whether he was able to perform fine and gross movements effectively. 20 C.F.R. Part 404, Subpart P, Appendix 1.00(B)(2)(c) explains what the agency means by an inability to perform fine and gross movements effectively:

> Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; *i.e.,* an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

In concluding that Kance did not meet Listing 1.02, the ALJ stated:

> The record shows that the claimant is able to care for his own personal hygiene, button a shirt, hold a gallon of milk, and tie his own shoes. Notes from the medical record show "mild pain with motion" (Exhibit 8F, page 3).

(Tr. 23). Kance argues that this explanation was inadequate because the record showed that he was incapable of sustaining reaching, pushing, pulling, grasping and fingering. Kance also argues that the ALJ mischaracterized the evidence regarding his abilities. ECF Doc. 14 at 20.

Kance testified that he was able to button his shirt. But, he said that he normally wore shirts that did not require buttoning and that he had difficulty with buttoning. (Tr. 49-50). Kance testified that he could not open jars. (Tr. 51). He testified that he bought quarts of milk rather than gallons so that he could lift them. (Tr. 52) Kance testified that it took him a long time to attend to his personal hygiene and that it was difficult to tie shoes. (Tr. 53, 58). The Commissioner concedes that the ALJ characterized the evidence differently than plaintiff's testimony. ECF Doc. 17 at 8. However, the Commissioner argues that "substantial evidence is a fairly low bar: more than a mere scintilla, yet enough that a reasonable mind might accept as adequate to support a conclusion." *See Hickey-Haynes v. Barnhart,* 116 F. App'x 718, 726 (6th Cir. 2004).

Plaintiff bears the burden to show that his impairment met a listing. *Berry v. Comm'r of Soc. Sec.,* 34 F. App'x 202, 203 (6th Cir. 2002). Here, it is a close call. The court would probably not remand this case solely on the ALJ's determination that Kance's impairments did not meet or medically equal Listing 1.02 even though the ALJ's discussion of the issue was extremely limited. However, a proper evaluation of the medical source opinions could affect the ALJ's analysis of whether Kance's evidence showed that his impairments met or medically equaled the criteria of Listing 1.02. Dr. Robson opined that Kance was unable to perform activities involving fine and gross manipulation. If the ALJ assigns controlling weight to Dr. Robson's opinion, he may conclude that Kance's impairments did meet or medically equal Listing 1.02. Also, because the Commissioner seems to concede that the ALJ mischaracterized

19

some of Kance's testimony, the ALJ must reconsider the testimony in making his Step Three analysis.

## VI.   Conclusion

Because the ALJ failed to apply proper legal standards in evaluating the medical source opinions, the Commissioner's final decision denying Kance's applications for SSI and DIB must be VACATED and the matter REMANDED for further proceedings consistent with this memorandum of opinion and order.

**IT IS SO ORDERED.**

Dated: June 6, 2019

Thomas M. Parker
United States Magistrate Judge